UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LATISHA BARNES

Plaintiff,

-against-

THE CITY OF NEW YORK; NEW YORK CITY POLICE DEPARTMENT ("NYPD") OFFICER KERRY BADALA, Shield No. 9018; NYPD OFFICER RALPH GEORGE, Shield No. 25572; NYPD OFFICER WILFREDO VELEZ, Shield No. 6517; NYPD OFFICER WILLIAMS DIAZ, Shield No. 25535; NYPD SERGEANT FNU LAU; NYPD CAPTAIN ANTHONY PIAZZA; NYPD OFFICER FNU STEVENS; NYPD OFFICER ONEIL SMITH, Shield No. 24425; NYPD SERGEANT YOSHIRA ROSARIO, Shield No. 1957,; NYPD OFFICER MICHAEL SOTO, Shield No.7535; NYPD OFFICER FRANCISCO DIODONET, Shield No. 31860; NYPD DETECTIVE JOHN SABINO, Shield No. 5733; JANE AND JOHN DOES 1-50,

Defendants.

No. 15 Civ. 9305 (WHP)

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

Ms. Latisha Barnes, ("Ms. Barnes" or "Plaintiff") by her attorneys, Emery Celli Brinckerhoff & Abady LLP and Poupa Jenny Marashi, Esq., for her First Amended Complaint, alleges as follows:

## PRELIMINARY STATEMENT

1. For years, the New York City Police Department ("NYPD") has maintained a warrant database that it knows to be riddled with errors. In particular, the NYPD knows that thousands of its entries showing open warrants for citizens' arrests are inaccurate. Plaintiff Latisha Barnes is one such citizen. Over the course of four years, Ms. Barnes was detained at least eleven times on a warrant that appeared in the database even though it did not exist.

2. In January 2011, Ms. Barnes received a summons for playing music in her apartment too loudly. When Ms. Barnes was late to court, a bench warrant issued for her arrest, but it was immediately vacated when she appeared. The summons was dismissed. But the NYPD-administered, extrajudicial fallout was just about to begin.

3. The bench warrant, which had been entered into the NYPD's open warrants database when it was issued, was not deleted when it was vacated. Instead, the NYPD kept it listed as an open warrant for over four years, until June 16, 2015.

4. From July 2011 through June 2015, police officers ran Ms. Barnes's name through their database and found an apparently open warrant on average once every three months. Sometimes officers took her identification and ran a warrant search for minor reasons (carrying an open container of alcohol, playing her music too loudly), and sometimes for no reason at all (picking her daughter up at a precinct). Each time they ran a search, officers discovered the warrant, incorrectly listed as open, and arrested Ms. Barnes.

5. Arresting Ms. Barnes based on the warrant entry was against NYPD's written policy. The NYPD Patrol Guide warned officers that their warrant database was unreliable, and that no arrest should be made without first verifying a warrant entry against the state courts' databases and records.

6. But the NYPD never trained its officers to crosscheck warrants or disciplined them for failing to do so, and supervisors routinely allowed subordinates to ignore the requirement. The NYPD knew that the database was replete with errors, which was designed to add new warrants automatically but not always to update them when they were vacated and deleted from the courts' records. Yet the NYPD continued to maintain and use the database without any policy or procedure for correcting its errors as a matter of course, or even for

officers to correct errors they discovered by happenstance.

7. As a result, NYPD officers have routinely arrested the subjects of vacated warrants. The arrests have been so frequent that the courts adopted a practice of issuing letters for victims to carry with them, informing officers that their apparently open warrants were a mistake.

8. As a result of this illegal practice, Ms. Barnes regularly spent hours and sometimes days in jail because of a warrant that had been judicially dismissed. Each time she was arrested, Ms. Barnes informed officers on the scene and officers at the precinct that her supposedly open warrant was false. But no one listened. And each time, even after the officers discovered their error and all charges were dismissed, no one bothered to correct the database. Soon, Ms. Barnes would once again find herself in custody on the dismissed warrant.

9. In the summer of 2014, Ms. Barnes was arrested twice in a little over a month. The second time, while in a holding cell at the NYPD's 40th Precinct, Ms. Barnes became so distressed and anxious she had trouble breathing. She had recently had surgery on a dislocated shoulder that was causing her substantial pain. Ms. Barnes repeatedly requested medical attention, which was denied. Utterly desperate, Ms. Barnes hanged herself in the holding cell. Even the officers who finally intervened to save her life and who saw the depth of her distress, their supervisors, and the internal affairs officers who reviewed their report made no effort to delete the database entry once they confirmed that, as Ms. Barnes claimed, she had been illegally arrested on an invalid warrant.

10. The database entry was not corrected until June 2015, but only after she had suffered profound and ongoing injuries, both physical and psychological.

11. Ms. Barnes seeks damages for her injuries and a declaration that the NYPD

policies and practices that caused them are unconstitutional.

## JURISDICTION AND VENUE

12. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Ms. Barnes's claims under the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

13. The Court has jurisdiction under 28 U.S.C. § 1367 over Ms. Barnes's related state-law claims, which arise out of the same transactions and occurrences that give rise to her federal claims.

14. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §1391 (a), (b), and (c).

## PARTIES

15. At all relevant times, Plaintiff Latisha Barnes was a citizen of the United States and a resident of Bronx County, City and State of New York.

16. Defendant City of New York is a municipal corporation organized and existing under the laws of the State of New York. At all relevant times, Defendant City, acting through the NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, and conduct of all NYPD personnel. In addition, at all relevant times, Defendant City was responsible for enforcing the rules of the NYPD and for ensuring that NYPD personnel obey the laws of the United States and of the State of New York.

17. Upon information and belief, defendant NYPD Officer Kerry Badala, Shield No. 9018, participated in arresting and/or detaining Ms. Barnes on January 28, 2012 based solely on the invalid warrant entry in the NYPD warrant database. At around 8:20 that evening, Officer

Badala personally accessed the warrant entry in the course of Ms. Barnes's arrest and/or detention and relied on it for authority to arrest Ms. Barnes without probable cause or confirmation of the warrant's validity. On information and belief, Officer Badala did not check the court's database as required by NYPD written policy before arresting Ms. Barnes.

18. Defendant NYPD Officer Ralph George, Shield No. 25572, participated in arresting and/or detaining Ms. Barnes on March 2, 2013, based solely on the invalid warrant entry in the NYPD warrant database. At around 9:30 that evening, Officer George personally accessed the warrant entry in the course of Ms. Barnes's arrest and/or detention and relied on it for authority to arrest Ms. Barnes without probable cause or confirmation of the warrant's validity. On information and belief, Officer George did not check the court's database as required by NYPD written policy before arresting Ms. Barnes.

19. Defendant NYPD Officer Wilfredo Velez, Shield No. 6517, participated in arresting and/or detaining Ms. Barnes on June 11, 2013, based solely on the invalid warrant entry in the NYPD warrant database. At around 2:30 that afternoon, Officer Velez personally accessed the warrant entry in the course of Ms. Barnes's arrest and/or detention and relied on it for authority to arrest Ms. Barnes without probable cause or confirmation of the warrant's validity. On information and belief, Officer Velez did not check the court's database as required by NYPD written policy before arresting Ms. Barnes.

20. Defendant NYPD Officer Williams Diaz (aka William Diaz), Shield No. 25535, arrested and/or detained Ms. Barnes on June 14, 2014 based solely on the invalid warrant entry in the NYPD warrant database. At around 11:40 that evening, Officer Diaz personally accessed the warrant entry in the course of Ms. Barnes's arrest and/or detention and relied on it for authority to arrest Ms. Barnes without probable cause or confirmation of the warrant's validity.

On information and belief, Officer Diaz did not check the court's database as required by NYPD written policy before arresting Ms. Barnes.

21. Defendants NYPD Sergeant FNU Lau, Captain Anthony Piazza, and Officer FNU Stevens learned at approximately 8:30 am on June 15, 2014 that the warrant entry in the NYPD warrant database was not valid and did not accurately indicate an open warrant for Ms. Barnes's arrest, but did nothing to correct the database and avoid foreseeable future illegal arrests of Ms. Barnes.

22. Defendants NYPD Officer Oneil Smith, Shield No. 24425, Sergeant Yoshira Rosario, Shield No. 1957, Michael Soto, Shield No. 7535, and Francisco Diodonet, Shield No. 31860, learned on or about June 15, 2014 that the warrant entry in the NYPD warrant database was not valid and did not accurately indicate an open warrant for Ms. Barnes's arrest, but did nothing to correct the database and avoid foreseeable future illegal arrest of Ms. Barnes.

23. Defendant NYPD Detective John Sabino, Shield No. 5733, is a detective in the NYPD Warrant Section, where he has been employed since 1996. At all relevant times, Detective Sabino's duties including administering the NYPD warrant database and correcting errors in the database.

24. Defendants Jane and John Doe 1-20 arrested and/or detained Ms. Barnes on one or more of March 2, 2013, June 11, 2013, October 8, 2013, May 4, 2014, May 9, 2014, June 14, 2014, August 4, 2014, December 16, 2014, March 22, 2015, and other dates unknown to Ms. Barnes between November 25, 2012 and August 31, 2015, based solely on the invalid warrant entry in the NYPD warrant database. Jane and John Does 1-20 knew at the time of the arrest and/or detention that the invalid warrant entry was the sole basis for Ms. Barnes's arrest and/or detention, and that its validity had not been confirmed at the time of the arrest and/or detention.

25. Defendants John and Jane Doe 21-40 learned on dates and times unknown to Ms. Barnes between April 6, 2011 and August 31, 2015, that the warrant entry in the NYPD warrant database was not valid and did not accurately indicate an open warrant for Ms. Barnes's arrest, but did nothing to correct the database and avoid foreseeable future illegal arrests of Ms. Barnes.

26. Defendant Officers Diaz and John and Jane Doe 41-50 knew on June 14 and 15, 2014 while Ms. Barnes was in the custody of the NYPD that Ms. Barnes was experiencing severe shoulder pain, chest pain, shortness of breath, and psychological distress for hours, and each of them ignored her pleas for medical attention.

27. Defendants Smith, Badala, George, Velez, Diaz, Lau, Piazza, Stevens, Rosario, Soto, Diodonet, Sabino, and John and Jane Doe 1-50 (collectively, "Officer Defendants") were at all relevant times acting in their capacities as NYPD officers and/or supervisors, under color of state law. The Officer Defendants are sued in their individual capacities.

## JURY DEMAND

28. Plaintiff demands a trial by jury in this action.

## FACTUAL ALLEGATIONS

### Ms. Barnes Is Persistently Arrested on a Non-Existent Warrant

29. On January 23, 2011, a summons was issued to Ms. Barnes for unreasonable noise, ordering her to appear in Bronx Criminal Court on April 6, 2011. Ms. Barnes was late to court, but when she did appear, the summons was dismissed and the matter should have been closed.

30. Despite resolution of the summons, however, a bench warrant was issued for Ms. Barnes's arrest. On April 7, 2011, the warrant was uploaded by the Office of Court Administration ("OCA") into its Criminal Records & Information Management System

("CRIMS") database, and in turn automatically entered into the NYPD Automated Warrant Database ("AWD"), a database run by the NYPD that compiles warrants from various local, state, and national sources.

31. Upon information and belief, the warrant, which was assigned the unique identifier A2011307057, was either issued in error or was ordered when Ms. Barnes appeared in court late on the summons and then was deleted when she did appear. Once the error was recognized or the warrant was deleted, the entry for the warrant in OCA's CRIMS database was removed.

32. But the warrant was not removed from the NYPD's AWD.

33. Between July 29, 2011 and June 4, 2015, Ms. Barnes was arrested at least *eleven times* based on the phantom warrant. On average, she was arrested once every fifteen weeks for four years.

34. Each time that Ms. Barnes was arrested, and every time she complained between her arrests, the NYPD was reminded that her outstanding warrant in its AWD was invalid. But the NYPD maintained the database entry until June 16, 2015. And its officers continued to arrest Ms. Barnes based on the entry.

35. The illegal arrests started less than four months after the AWD entry was created. Ms. Barnes was arrested because of the warrant on July 29, 2011 and on many occasions thereafter—including August 24, 2011, January 28, 2011, March 2, 2013, June 11, 2013, May 4, 2014, May 9, 2014, June 14, 2014, August 4, 2014, December 16, 2014, and March 22, 2015.

36. For some of these arrests, Ms. Barnes was not suspected of doing anything illegal and would never have been arrested but for a chance encounter with Officer Defendants during which they ran warrant searches. On other occasions, Officer Defendants may have had

probable cause to suspect that Ms. Barnes had committed a minor offense, but they would not have taken her into custody absent the erroneous warrant entry.

37. For example, on January 28, 2012, when Ms. Barnes was hosting a party, NYPD officers came to her apartment to ask her to turn down her music. If not for the erroneous warrant entry, Ms. Barnes would, at worst, have been issued a summons. But Defendant Officer Badala and other Defendant Officers found the invalid entry in the AWD and, without cross-checking CRIMS or otherwise verifying its validity, they arrested her on the basis of the vacated warrant.

38. On May 4 and 9, 2014 and March 22, 2015, Ms. Barnes encountered Officer Defendants when she went to the 40th Precinct to pick up her daughter. Each time, the Officer Defendants ran an AWD search and arrested her on the vacated warrant. On each of these occasions, Ms. Barnes had done nothing to make any of the Officer Defendants suspect that she had committed a crime, but they arrested her without any basis, solely because of the invalid AWD warrant entry.

39. On June 14, 2014, Ms. Barnes was arrested due to the erroneous AWD warrant entry after being stopped for an alleged open container violation. Defendant Officer Diaz and other Officer Defendants saw Ms. Barnes and her sister on the street with cups and stopped them. The Officer Defendants gave Ms. Barnes and her sister summonses for the alleged open container violations. They then ran the women's names through the AWD and arrested Ms. Barnes without bothering to check the validity of the warrant they found. Ms. Barnes's sister was not arrested. The only difference between them was that Ms. Barnes's name (incorrectly) appeared in the AWD while her sister's did not.

40. On August 4, 2014, Ms. Barnes was again arrested because of the warrant entry.

She was sitting with co-workers, who were smoking marijuana, on a break from a construction job. Ms. Barnes was not smoking, and there was no reason to believe that she was. Even if she had been smoking, if not for the erroneous warrant entry, Ms. Barnes would, at worst, have been issued a summons. In fact, Ms. Barnes *was* issued a summons for marijuana possession—which was later dismissed—*before* Officer Defendants ran a warrant search, found the warrant, and decided to arrest her instead. On information and belief, Ms. Barnes's co-workers were issued summonses; none of them was arrested.

41. On each of these occasions, on July 29, 2011, August 24, 2011, March 2, 2013, June 11, 2013, and December 16, 2014, and on other occasions known to the Defendant City, but not presently known to Ms. Barnes, Ms. Barnes was arrested only because of the invalid AWD entry. If the NYPD had not maintained that entry, and if the Defendant Officers had not relied on it, Ms. Barnes would, at worst, have been issued a summons. On many of those occasions, absent the entry, Ms. Barnes would not have been subjected to any consequences, because there was no reason to suspect that she had violated any laws.

**Ms. Barnes Is Unable to Clear the Invalid Warrant from NYPD Records**

42. Ms. Barnes's repeated arrests were profoundly disorienting, stressful, and disruptive to her life. They substantially interfered with her responsibilities as a parent and an employee, and they were frightening. Ms. Barnes tried to correct the false database entry that was ruining her life to no avail.

43. For example, Ms. Barnes traveled to the Bronx Criminal Court, where she spoke to the clerk and was told she had no outstanding warrant in the court system.

44. Confused about why she nonetheless continued to be arrested, Ms. Barnes found a telephone number on the NYPD website that purported to allow citizens to protest warrants listed

in the NYPD system. But when Ms. Barnes called the number, she discovered it was not a working number.

45. Ms. Barnes visited Bronx Criminal Court where the warrant initially issued—and was deleted. The Clerk of Court confirmed that the April 7, 2011 warrant was not valid and had been deleted from CRIMS. The Clerk issued Ms. Barnes a letter instructing NYPD officers not to arrest her on the basis of the warrant. But the arrests continued.

46. The repeated illegal arrests and detentions, the constant stress of knowing she could be arrested at any time for no reason, and her powerlessness to correct the error were unbearable for Ms. Barnes.

**Ms. Barnes's Attempted Suicide**

47. During one arrest in June 2014, Ms. Barnes attempted suicide.

48. On June 14, 2014, Ms. Barnes was arrested on the warrant for the ninth time—and the third time in less than six weeks.

49. On Saturday, June 14, 2014, at around 11:40 p.m. when Ms. Barnes was stopped with her sister on suspicion of an open container violation, she knew what was coming. Providing her identification to the Officer Defendants who had stopped her, including Officer William Diaz, Ms. Barnes explained that the system might indicate an open warrant for her arrest but that the entry was inaccurate.

50. Ms. Barnes explained that she had already been illegally arrested time and again on the inoperative warrant and she asked the officers to call the 40th precinct to confirm her account. She explained that she had visited the Bronx Criminal Court Clerk's Office and confirmed that there was no active warrant for her arrest. She also explained that she had tried to have the NYPD address its database error but had either been told that there was nothing

anybody could do or been directed to a nonworking number.

51. Officer Diaz issued Ms. Barnes a summons, No. 4417517410, for an open container violation. After he issued the summons, he ran a search for Ms. Barnes in AWD and found the warrant listed.

52. Ignoring everything that Ms. Barnes had told him, Officer Diaz and the other Officer Defendants made no effort to confirm the validity of the listing. Instead, they arrested Ms. Barnes. With no indication in the AWD of a warrant in her name, Ms. Barnes's sister was not arrested.

53. Officer Diaz handcuffed Ms. Barnes tightly. Ms. Barnes complained that she had a continually dislocating shoulder she had recently received surgery to correct, that the handcuffs were straining her damaged shoulder, and that she was in severe pain. Again, the Officer Defendants ignored her.

54. Ms. Barnes was brought to the 40th Precinct. There, she tried again to explain that the open warrant notation in the AWD was inaccurate, and she pleaded for help. The officers on duty laughed at her and did nothing to help.

55. Despite her pleas and explanations, Ms. Barnes was placed in one of the precinct's holding cells, where she would spend the night, waiting for transportation to Bronx Central Booking.

56. Ms. Barnes felt helpless, knowing she was unable to prevent her nightmarish situation from repeating itself ad infinitum. She thought of her daughters, aged 8 and 14, home without her—left as they had been each time she was arrested. Her shoulder was in great pain, and she was in distress. Ms. Barnes felt her chest tightening and had difficulty breathing.

57. Desperate, Ms. Barnes begged to be transferred to a hospital. She complained of

her chest and shoulder pain and told the officers at the precinct that she needed medical attention. Throughout the night, Ms. Barnes repeated her request for medical attention to multiple officers. Each time, she was ignored.

58. By 6:55 a.m. on June 15, 2014, Ms. Barnes had been in custody for seven hours, and she could not stand another minute. She knew that no matter how patiently she waited for her release this time, she would find herself back in a cell before long.

59. Ms. Barnes hanged herself from a bar in the cell.

60. Officers at the precinct intervened, but not before Ms. Barnes had suffered damaging oxygen deprivation. Ms. Barnes was taken to Lincoln Hospital under police custody.

61. Only *after* Ms. Barnes had attempted suicide and been taken to the hospital did anyone at the precinct attempt to verify the validity of the warrant. At 8:30 a.m. on June 15, 2014, nine hours after Ms. Barnes's arrest, NYPD Sergeant Lau and Captain Piazza at the 40th Precinct and POF Stevens of the warrant squad finally searched CRIMS and discovered that the warrant on which Ms. Barnes had been arrested was invalid. Ms. Barnes was immediately released from NYPD custody, but she would remain at Lincoln Hospital, against her will, for over four days.

62. On June 19, 2014, five days after her arrest, Ms. Barnes was at last allowed to return home to her children.

63. The reprieve would not last long. About seven weeks later, Ms. Barnes was arrested again.

**The Officer Defendants Acted in Violation of NYPD Policy and with Deliberate Indifference to Ms. Barnes's Constitutional Rights**

64. Each time that Ms. Barnes was arrested on the warrant, she told the relevant

Officer Defendants that she did not have an open warrant and that the AWD entry was wrong.

65. Every Officer Defendant who arrested Barnes, extended her detention, or otherwise punished her for the invalid AWD entry chose not to search for the warrant in the CRIMS database to confirm the AWD entry's accuracy. Had they done so, they would have discovered that it was invalid.

66. The Officer Defendants' reliance on the AWD was contrary to NYPD policy.

67. The NPYD Patrol Guide, 208-22:10, states that an officer who finds an open warrant on the AWD "MUST conduct a further inquiry via Criminal Record Information and Management System (C.R.I.M.S.) court computer application, which will provide 'the last status of the warrant.'" The Patrol Guide, 208-22:17 Note & Additional Data, explains that the "purpose of conducting this inquiry is to verify the status of warrants" and emphasizes that the CRIMS database can reveal that warrants in the AWD have been "VACATED." The CRIMS check is so important that the Patrol Guide, 208-22:17 Additional Data, instructs officers that if they confront technical obstacles to accessing the CRIMS database, they should request another precinct or the Central Warrant Unit to perform the check.

68. The Officer Defendants who relied on the warrant entry therefore knew or should have known it to be unreliable, and yet arrested Ms. Barnes or extended her detention because of it in blatant and deliberate disregard of her constitutional rights.

69. Each time that Ms. Barnes was arrested or detained while the warrant appeared in the AWD, one or more Officer Defendants ran Ms. Barnes's information through the CRIMS database only *after* she had been taken to the precinct and/or central booking—sometimes after she had already spent one or more nights in jail.

70. Each time, after the Officer Defendants confirmed that Ms. Barnes did not in fact

have an open warrant, she was released. But the Officer Defendants who now knew that Ms. Barnes's warrant listing in AWD was invalid did nothing to correct the database.

71. For example, on June 15, 2014, after Ms. Barnes had spent the night in the holding cell at the 40th Precinct, where she tried to kill herself, Sergeant Lau, Captain Piazza and POF Stevens—like many Officer Defendants before them—ran the CRIMS search and learned the truth but did nothing to correct the database.

72. By June 15, 2014, multiple other officers in the 40th Precinct, including Sergeant Yoshira Rosario and Officers Oneil Smith, Michael Soto, and Francisco Diodonet, and the NYPD's Internal Affairs unit, including Officer Temple Valencia and Sergeants Michael Jackson and Betsy Gonzales, had written, heard, or reviewed reports concerning Ms. Barnes's attempted suicide that included the revelation that Ms. Barnes had been arrested on an invalid warrant listed in the AWD database.

73. Like Lau, Piazza, and Stevens and the Officer Defendants involved in arresting and detaining Ms. Barnes before and after June 14, 2014, the officers who learned about the error made *no* effort to correct it and avoid foreseeable future illegal arrests of Ms. Barnes.

74. Instead, they sat back, not caring that Ms. Barnes had been arrested because of the warrant entry and not caring that she would undoubtedly be arrested because of it again. And indeed she was, at least three more times before the database entry was finally deleted.

**The NYPD Has a Policy and Practice of Arrests Based on Invalid Warrants**

75. The NYPD included a provision in the Patrol Guide requiring that AWD entries be confirmed by CRIMS searches before an arrest is made because it *knew* that the AWD database included false entries for warrants that were not valid.

76. The problem of illegal arrests based on false entries in the AWD has not been limited to Ms. Barnes. It is so widespread and well known that it has been the subject of other lawsuits, hundreds of letters issued by OCA, and New York City Council hearings.

77. One such hearing was held on May 26, 2016 by the City Council Committee on Courts and Legal Services. At the hearing, Chester Mount, Director of Court Research and Technology for OCA, testified that the CRIMS database and the AWD were designed in such a way that information about warrants entered into CRIMS would automatically populate the AWD *except* when a warrant was deleted in CRIMS. The NYPD therefore knew that its officers would have no way of knowing if a warrant was deleted without reviewing CRIMS.

78. The NYPD knew about this systematic problem long before these hearings. For years, advocates have complained to, and have had meetings with, high ranking NYPD officials regarding this problem.

79. Despite this known and significant flaw, the NYPD insisted on providing its own, inaccurate database to its officers and training them to use the AWD in the first instance, rather than the CRIMS database. As Mount testified at the City Council hearing, there was no reason for the NYPD to use its own database to search for New York State warrants.

80. The persistent and numerous arrests based on erroneous AWD entries are also reflected in lawsuits filed by other victims of the practice. For example, in August 2013, the City settled a lawsuit with Rafael Satterfield based on his arrest on a vacated warrant. Even then, the NYPD failed to correct its records and *continued* to arrest Mr. Satterfield on the invalid warrant after the settlement, provoking a second lawsuit. *See also, e.g.*, *Richardson v. City of N.Y., et al.*, No. 16-cv-5207 (S.D.N.Y. 2016) (plaintiff arrested on warrant that was not in OCA database); *Bowen v. City of N.Y., et al.*, No. 14-cv-6811 (E.D.N.Y. 2014) (plaintiff carrying “do not arrest

letter" issued by court suffered multiple arrests on warrant erroneously listed for six years and not corrected until civil law suit filed and federal district court judge ordered City to confirm warrant had been closed); *Mercado v. City of N.Y., et al*, No. 14-cv-4169 (S.D.N.Y. 2014) (plaintiff carrying "do not arrest letter" suffered multiple arrests on erroneously listed warrant).

81. The City has *never* taken any action to correct the problem. On information and belief, after the May 26, 2016 hearing, *OCA* changed its policy to address the *NYPD's* faulty database prospectively. It instructed its staff to avoid deleting warrant entries from CRIMS—a change that would not be reflected in the AWD—and instead update mistaken and vacated warrants in such a way that the status changes would be reflected in AWD. On information and belief, neither OCA nor the City has taken any action to address the false entries that already populate the AWD.

82. The Bronx County Criminal Court Clerk's Office has also attempted to help people avoid illegal arrest by the NYPD. For people who complain about arrests based on false AWD entries, the Clerk's Office provides letters to be carried at all times for presentation to NYPD officers, confirming that their cases have been closed and their warrants dismissed. The problem is so widespread that, on information and belief, that Clerk's Office issues approximately eight such letters *every week* to individuals complaining about unauthorized arrests on nonexistent warrants. And these complainants are only a minor subset of those affected—those who think to visit the court, and who miss work, find child care, and make otherwise extraordinary efforts to travel to court on the mere hope of some assistance, and those who, after all that sacrifice, receive a letter from the Clerk, who has no formal responsibility to issue them. The NYPD, while taking no action of its own to curb the practice, routinely ignores such letters.

83. The City, the NYPD, and, in particular, commanding officers at the 40th Precinct failed to train officers not to arrest individuals based solely on AWD searches, even though they knew that NYPD officers routinely arrested people for warrants in the AWD without verifying them in the CRIMS database.

84. In Ms. Barnes's case alone, numerous NYPD officers and supervisors at the 40th Precinct were repeatedly made aware that Ms. Barnes was being continuously arrested on her erroneous AWD warrant listing, but they did nothing to halt the abuse.

85. The City and the NYPD have also failed to establish any policy or practice for reconciling the AWD with the CRIMS database or even correcting errors in the AWD that are brought to its attention. And the NYPD never trained the Officer Defendants about correcting such errors.

86. The most significant step taken by the NYPD to address the problem was to provide a phone number to members of the public hoping to correct errors in their own records. That number was inoperative.

87. In a city with over one million open warrants, the NYPD at all relevant times had a *single* employee who would correct records errors to which he was alerted, and even then—as Molly Kovel from the Bronx Defenders testified at the May 26, 2016 City Council hearing—only when he was repeatedly pressed by advocates for years.

88. That individual, Defendant Detective Sabino, was personally responsible for ensuring the accuracy of the AWD entries. Detective Sabino was in regular contact both with supervisors in the Bronx Criminal Court Clerk's Office and with advocates from the Bronx Defenders and other organizations and knew of both the existence and the scope of the problem that so affected Ms. Barnes's life.

89. Although he understood the problem, and although his job responsibilities, as described on the New York Courts website, was at all relevant times to verify the status of all arrest warrants, provide accurate information to field investigators, and maintain records regarding arrest or bench warrants, Detective Sabino has done nothing to identify or correct the false records that he knew permeated the AWD. Neither has any other NYPD officer.

**Ms. Barnes Suffers Severe Disabilities Because of Her Illegal Arrests**

90. As a result of her repeated arrests on the false warrant entry, and the Defendant Officers' and NYPD's ongoing failure to correct its database, Ms. Barnes was under constant threat of arbitrary, unlawful arrest and therefore deprived of her basic liberties. The ever-present risk of being stopped and arrested without process or cause left Ms. Barnes unable to feel truly free even when she was not incarcerated.

91. Ms. Barnes's arrests were unbearable, causing both acute and chronic physical and psychological suffering. Each of the arrests, amounting to *days* of illegal imprisonment, were frightening and humiliating, and often physically excruciating. They interrupted and impaired her relationships with her family and her employers. The constant fear of being arrested for no reason—on a warrant that the NYPD *knew* did not exist—filled Ms. Barnes with a lasting and constant anxiety. The senseless, surreal, and nightmarish cycle in which she was trapped left Ms. Barnes constantly disoriented, helpless, and at times suicidal.

92. Following her suicide attempt, which was the direct and proximate result of her ordeal, Ms. Barnes experiences ongoing and debilitating memory loss, blackouts, vertigo, and headaches. Ms. Barnes will continue to suffer the painful consequences of the Defendants' total indifference for years to come and perhaps indefinitely.

**FIRST CAUSE OF ACTION**

42 U.S.C. § 1983 – False Arrest & False Imprisonment
(Against All Defendants)

93. Paragraphs 1 through 92 are fully incorporated.

94. The Officer Defendants wrongfully and illegally arrested Ms. Barnes and/or failed to intervene to prevent Ms. Barnes's wrongful arrest, and continued to detain Ms. Barnes on the false basis that she had an open warrant for arrest.

95. The wrongful, unjustifiable, and unlawful apprehensions, arrest, and detentions were carried out without any reasonable basis, without Ms. Barnes's consent, and without probable cause or reasonable suspicion.

96. The Officer Defendants continued to arrest and detain Ms. Barnes even after they knew that she did not have any open warrants.

97. The Officer Defendants were also deliberately indifferent to known errors in the AWD that they knew or should have known would cause perpetual illegal arrests of Ms. Barnes, and they never corrected the warrant entry even after they learned it was wrong.

98. At all relevant times, the City had ongoing unconstitutional policies, customs, patterns, and practices of:

a. Failing to adequately train NYPD officers to avoid making unlawful arrests based on invalid AWD entries. The City failed to train officers that an AWD entry is not a valid basis for an arrest, that officers must cross-check the CRIMS database before making any arrest based on an AWD entry, that any doubt concerning whether a bench warrant is open should be resolved by using court records, and that AWD entries discovered to be inaccurate must be corrected.

b. Maintaining a warrants database that it knew to contain false entries, and ignoring specific errors in the database that were brought to the NYPD's attention.

c. Failing to adequately supervise or discipline NYPD officers with respect to arrests made on bench warrants and maintenance of the AWD.

d. Maintaining a false entry in its AWD database for an outstanding bench warrant for Ms. Barnes's arrest when it knew that the warrant never existed or had been vacated, and arresting Ms. Barnes illegally and without cause on the basis of that warrant.

e. Having no policy for correcting individual erroneous entries when brought to officers' attention or redress for individuals knowing about false entries in their names.

99. The unconstitutional policies, customs, patterns, and practices described above were known to and either explicitly or tacitly approved by policymakers within the City and were a persistent and widespread custom and practice of the City. In maintaining these policies and practices, the City was deliberately indifferent to the constitutional rights of all persons generally, and Ms. Barnes specifically.

100. The City was aware and deliberately indifferent that its unconstitutional policies, customs, patterns, and practices described above would lead to the deprivation of Ms. Barnes's and others' constitutional rights. The City knew to a moral certainty that the AWD contained invalid warrant entries, and that NYPD officers would rely on those entries to make arrests without probable cause or legal justification.

101. The failure to supervise and/or train by the City of the Defendant Officers rose to the level of deliberate indifference to the consequences of its actions, and indifference to Ms. Barnes's rights, privileges, and immunities secured by the Fourth Amendment to the United States Constitution.

102. The City's policies, customs, patterns, and practices constituted deliberate indifference to Ms. Barnes's safety, wellbeing, and constitutional rights.

103. As a result, Ms. Barnes was unlawfully, wrongfully, and unjustifiably held under arrest and deprived of her liberty without basis and without probable cause at least ten times since 2011, and at least eight times since November 25, 2012: on July 29, 2011, August 24, 2011, January 28, 2011, March 2, 2013, June 11, 2013, May 4, 2014, May 9, 2014, June 14, 2014, August 4, 2014, December 16, 2014, March 22, 2015, and on other dates unknown to Ms. Barnes.

104. The acts of the Officer Defendants, and the policies, customs, patterns, and practices of the City, independently directly and proximately caused Ms. Barnes's deprivation of rights under the Fourth Amendment and her resulting injuries.

**SECOND CAUSE OF ACTION**
Common Law False Arrest/Imprisonment
(Against the Officer Defendants)

105. Paragraphs 1 through 104 are fully incorporated.

106. The acts and conduct of the Officer Defendants in wrongfully and illegally arresting and detaining Ms. Barnes constitute false arrest and false imprisonment under the laws of the State of New York.

107. The Officer Defendants intended to confine Ms. Barnes and/or failed to intervene to prevent the confinement of Ms. Barnes; the Officer Defendants, in fact, confined Ms. Barnes, and Ms. Barnes was conscious of the confinement. In addition, Ms. Barnes did not consent to the confinement and the confinement was not otherwise privileged.

108. The wrongful, unjustifiable, and unlawful apprehension, arrest, and detention of Ms. Barnes was carried out without any basis, without Ms. Barnes's consent, and without probable cause or reasonable suspicion.

109. At all relevant times, the Officer Defendants acted forcibly in apprehending and arresting Ms. Barnes without any fault or provocation on the part of Ms. Barnes.

110. The Officer Defendants were at all times agents, servants, and employees acting within the scope of their employment by the NYPD and Defendant City. Defendant City is therefore responsible for their conduct under the doctrine of *respondeat superior.*

111. As a direct and proximate result of the misconduct and abuse of authority detailed above, Ms. Barnes sustained the injuries resulting from her unlawful arrests.

**THIRD CAUSE OF ACTION**
42 U.S.C. § 1983 – Violation of Due Process
(Against All Defendants)

112. Paragraphs 1 through 111 are fully incorporated.

113. The Officer Defendants knew that Ms. Barnes had been falsely arrested and detained, and knew that Ms. Barnes would continue to be falsely arrested and detained, because of information contained in the AWD that was or could be invalid, and they continued to maintain and rely on the AWD without taking any steps to modify or delete incorrect information.

114. The Officer Defendants additionally continued to enforce a warrant that they knew or should have known had never been judicially ordered or had been judicially vacated.

115. At all relevant times, the City had the ongoing unconstitutional policies, customs, patterns, and practices described above.

116. The City knew to a moral certainty that NYPD officers would maintain AWD

warrant entries that they knew to be incorrect without taking any steps to modify or delete them. The City also knew to a moral certainty that NYPD officers, relying on the AWD database, would enforce warrants that had never been judicially ordered or that had been judicially vacated.

117. The failure to supervise and/or train by the City of the Defendant Officers rose to the level of deliberate indifference to the consequences of its actions, and indifference to Barnes's rights, privileges, and immunities secured by the Fourteenth Amendment to the United States Constitution.

118. The City's policies, customs, patterns, and practices constituted deliberate indifference to Barnes's safety, wellbeing, and constitutional rights.

119. As a result, Ms. Barnes was unlawfully deprived of the rights, remedies, privileges, and immunities guaranteed to every citizen of the United States and without due process of law.

120. The acts of the Officer Defendants, and the policies, customs, patterns, and practices of the City, independently directly and proximately caused Ms. Barnes's deprivation of rights under the Fourteenth Amendment and resulting injuries.

## **FOURTH CAUSE OF ACTION**

New York Constitution, Article I, Section 6 – Violation of Due Process
(Against the Officer Defendants)

121. Paragraphs 1 through 120 are fully incorporated.

122. The acts and conduct of the Officer Defendants in maintaining a database that they knew to contain false information about a warrant for Ms. Barnes's arrest, their failure to take an steps to modify or delete incorrect information, and their continued enforcement against

Ms. Barnes of a warrant that they knew or should have known had never been judicially ordered or had been judicially vacated constituted a violation of due process under the Constitution of the State of New York.

123. The Officer Defendants were at all times agents, servants, and employees acting within the scope of their employment by the NYPD and Defendant City. Defendant City is therefore responsible for their conduct under the doctrine of *respondeat superior.*

124. As a direct and proximate result of the misconduct and abuse of authority detailed above, Ms. Barnes sustained the injuries resulting from the denial of her due process rights.

**FIFTH CAUSE OF ACTION**

42 U.S.C. § 1983 – Denial of Medical Care

(Against Defendant Officers Diaz and John and Jane Doe 41-50)

125. Paragraphs 1 through 124 are fully incorporated.

126. On June 14 and 15, 2014, Defendant Officers Diaz and John and Jane Doe 41-50 ignored, refused, denied, and/or delayed Plaintiff's requests for medical attention.

127. Each and every one of those officers knew that Ms. Barnes was experiencing severe physical pain—including chest pain and weakening on the left side of her body—and psychological distress because she told them about her suffering and begged them for help. The actions of these Officer Defendants were malicious.

128. By refusing to take Ms. Barnes to the hospital and continuing her detention without providing any access to the medical and mental health care that she needed, the officers acted with deliberate indifference to her safety, health, and immediate medical needs and deprived Ms. Barnes of rights, remedies, privileges and immunities guaranteed under the Fourth and Fourteenth Amendments.

129. As a direct and proximate result of the defendants' deliberate indifference, Ms.

Barnes's resulting physical, psychological, and emotional injuries, pain, and suffering were caused and/or significantly exacerbated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Latisha Barnes respectfully requests that judgment be entered as follows:

a. As against all Defendants and on all claims, compensatory damages in an amount to be determined at trial;

b. As against the Officer Defendants and on all claims, punitive damages in an amount to be determined at trial;

c. As against all Defendants, reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

d. A declaration that the policies and practices described herein are unconstitutional; and

e. Such other and further relief as the Court may deem just and proper.

Dated: October 3, 2016
New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP

/s/

Elizabeth S. Saylor
Hayley Horowitz

600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000 (t)
(212) 763-5001 (f)

esaylor@ecbalaw.com
hhorowitz@ecbalaw.com

POUPA JENNY MARASHI, Esq.
930 Grand Concourse, # 1E
Bronx, NY 10451
(917) 703-1742
marashi.legal@gmail.com

*Attorneys for Plaintiff*